UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LATINA KIRKSEY on behalf    )
of L.K.,                    )
                            )
            Plaintiff,      )
                            )
        vs.                 )        No. 4:06-CV-572 (CEJ)
                            )
MICHAEL J. ASTRUE[1],       )
Commissioner of Social      )
Security,                   )
                            )
            Defendant.      )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I.  Procedural History

On October 17, 2003, Latina Kirksey filed an application on behalf of her daughter, plaintiff L.K., for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. 63-65).  The application alleged that disability began on June 1, 1999.  (Tr. 63).  After the application was denied on initial consideration (Tr. 44-47), plaintiff requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 48-49).

---

[1]Michael J. Astrue became the Commissioner of Social Security on January 20, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The hearing was held on June 6, 2005. (Tr. 20-38). Plaintiff was represented by counsel. The ALJ issued a decision on October 18, 2005, denying plaintiff's claim. (Tr. 11-19). The Appeals Council denied plaintiff's request for review on March 22, 2006. (Tr. 3-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. <u>See</u> 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. <u>Testimony at the Hearing</u>

Plaintiff's mother Latina Kirksey was the sole witness at the hearing on June 6, 2005. Plaintiff[2] resided with her mother and an older brother; plaintiff had had no contact with her father since 2000. (Tr. 26). Although Ms. Kirksey was employed full time, plaintiff was enrolled in Medicaid. (Tr. 27-28). Ms. Kirksey testified that she applied for disability benefits for her daughter because "she was having problems in school, and I did it because it would help her in the future. She's unable to deal with getting a job. I know she could probably get a job, but it would help her in the long run . . . if she weren't able to help herself." Ms. Kirksey further testified that she sought "the money to try to get her a little extra help with school." (Tr. 25-26). In her testimony, Ms. Kirksey stated that she had the following concerns: plaintiff's educational performance, her behavioral difficulties, and asthma.

---

[2]Plaintiff was 13 years old at the time of the hearing.

Plaintiff received special education services. Ms. Kirksey testified that plaintiff frequently required help with her homework in math, reading, writing, and "trying to get the sentences in order." (Tr. 28). Ms. Kirksey said that she had received "several calls" from teachers, who reported that plaintiff was "being disrespectful and cursing." (Tr. 30). She sent plaintiff to her room or barred her from watching television as punishment for her misconduct. (Tr. 31).

According to Ms. Kirksey, plaintiff was often in conflict with others. For example, plaintiff frequently picked on and teased her older brother, who responded by hitting her. (Tr. 32). Ms. Kirksey testified that plaintiff argues with her; she described plaintiff as being "mean" because plaintiff didn't want to spend time with her. (Tr. 36). Plaintiff no longer had friends in the neighborhood because they wanted to fight with her. (Tr. 29). Plaintiff had "about five" friends outside of school, with whom she got along "so-so." (Tr. 32). Plaintiff and her school friends frequently engaged in name calling or criticized each other, something that plaintiff "can't deal with." (Tr. 33). Ms. Kirksey testified that plaintiff had been involved in "a couple of fights," but she was not sure whether any had resulted in suspension from school.[3] (Tr. 29). About a month before the hearing, plaintiff got into a fight that was started by some other children and sustained a swollen lip. (Tr. 37).

---

[3]School records indicate that plaintiff received a three-day suspension for fighting on October 21, 2004. (Tr. 74).

Ms. Kirksey testified that plaintiff had asthma for which she took Albuterol[4] and Singulair[5] and used an inhaler every two hours. (Tr. 34). In January 2006, plaintiff had a severe asthma attack at home. Ms. Kirksey said plaintiff experienced back pain, shortness of breath, and tightening in her chest and "could have probably . . . died." (Tr. 33). Despite her asthma, plaintiff is able to participate in gym and other physical activities such as sports or cheerleading at school. (Tr. 35).

**B.    School records and other records before the ALJ**

The documentary record before the ALJ included school records, evaluations completed as part of the disability determination, documents completed by plaintiff's mother in the application process, and medical records.

**1.    School records**

In July 2000, when plaintiff was eight years old and had just completed second grade, the Saint Louis Public Schools completed an initial Psychological Educational Assessment. (Tr. 205-16). Academic problems which were evident when plaintiff was in first grade escalated during second grade. According to her second grade teacher, plaintiff was failing to acquire basic readiness skills. (Tr. 205). She performed at the Kindergarten level in reading and mathematics and at the first grade level in spelling and written

---

[4]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. *See* Phys. Desk Ref. 3067 (60th ed. 2006).

[5]Singulair is indicated for the prophylactic and chronic treatment of asthma and for relief of symptoms of allergic rhinitis. *See* Phys. Desj Ref. 2080 (61st ed. 2007).

expression. She had poor word attack skills and limited vocabulary and required constant one-on-one instruction in mathematics. The teacher described plaintiff as exhibiting little self-confidence. (Tr. 207). Although plaintiff had severe problems in the area of work habits, her classroom behaviors were not problematic. (Tr. 211).

The Weschler Intelligence Scale for Children, Third Edition (WISC-III), was administered on July 18, 2000, with plaintiff receiving the following scores: Verbal IQ of 76, Performance IQ of 70, and Full Scale IQ of 71. According to the examiner, these scores placed her in the borderline range of cognitive functioning. The difference between the verbal and performance scales was not significant. Her scores clustered in the weak/very weak range, with relative strengths on measures of word knowledge, social judgment and common sense, and perception, concentration, and alertness to detail. Relative weaknesses were found on measures of arithmetical reasoning and concentration and visual motor integration skills. (Tr. 206). Plaintiff's score on the Vineland Adaptive Behavior Scale, Interview Edition, yielded a composite age equivalent of 5 years, 1 month and a standard score of 60, which was generally consistent with plaintiff's cognitive functioning. Id.

Current levels of academic achievement were measured on the Wide Range Achievement Test – Revised and the Written Expression Test. The results indicated that plaintiff's achievement lagged significantly behind her cognitive ability in basic reading skills,

arithmetic calculations, and written expression. (Tr. 207). It was concluded that plaintiff had "the potential of achieving to a greater degree" and might benefit from an individualized program with emphasis on the skills of basic reading, math, and written expression. Additional recommendations included helping plaintiff to develop a solid foundation of basic sight words and counseling to develop self confidence and self esteem. (Tr. 215).

The record includes an Individualized Education Program (IEP) dated August 23, 2001, when plaintiff was about to enter the fourth grade at the St. Louis Charter School. (Tr. 92-106). No concerns were noted in the areas of health, motor, vision, hearing, or speech and language, including fluency and articulation. Although plaintiff got along well with peers and adult authority figures, she was described as overly dependent and lacking in self-confidence. Her classroom teachers reported that plaintiff functioned at the Kindergarten level in reading and math and at the first grade level in spelling and language. (Tr. 93). She was assigned to a self-contained classroom more than 60% of the time, with participation in regular physical education. (Tr. 98-99). Among the accommodations identified as suitable for plaintiff were small group instruction, extended time for assignments, repeated review, and directions given in a variety of ways. (Tr. 105).

An IEP dated October 29, 2002 appears in the record. (Tr. 187-204). At the time, plaintiff was ten years old and was a fifth grade student attending Shenandoah School in the St. Louis school district. (Tr. 187). Plaintiff was performing below grade level

in all areas (1.5 to 2.0 in mathematics and 2.0 to 2.5 in reading, language, and spelling). (Tr. 189). She was described as getting along "very well" with peers and adult authority figures. She "gained a great deal of self-confidence and is no longer overly dependent," though she displayed insecurity in some areas, with fluctuations in her ability to function academically. She exhibited "an 'attitude' at times." It was decided to continue plaintiff's placement in special education more than 60% of the time, with inclusion in general education for art, music, physical education, lunch and recess. (Tr. 202).

Plaintiff's IEP was reviewed on April 29, 2003. (Tr. 163-79). At the time, plaintiff was eleven years old and was a student in a self-contained classroom at Garfield Elementary School in the Normandy school district. She was described as having an educational diagnosis of learning disabled, which affected the amount of content she retained and the rate at which she learned. She continued to perform well below grade level in reading, language and written communication, and arithmetic. She required re-teaching and review to aid retention, small group instruction, and alternative curricula. (Tr. 164). Identified strengths included a desire to please, her willingness to seek help when needed, and promptly starting her work. Id. It was decided to continue plaintiff's placement in special education more than 60% of the time. (Tr. 175).

A teacher questionnaire was completed on November 30, 2003, when plaintiff was a student at Jefferson Elementary School in the

Normandy school district. (Tr. 177-86). Plaintiff was then in a self-contained classroom for all subjects and was being instructed at a third grade level. (Tr. 177). She was rated as having "an obvious problem" on every measure of acquiring and using information, (Tr. 178); "no problem" on a majority of measures of attending and completing tasks, although she had "obvious problems" in carrying out instructions and completing work without careless mistakes, (Tr. 181); and "no problem" in interacting and relating with others, moving about and manipulating objects, or caring for herself. (Tr. 182-84). Plaintiff's teacher described her as "work[ing] very well independently but requir[ing] monitoring for understanding, especially with subtraction, reading workbook and written expression. Spelling is very weak." (Tr. 181).

Plaintiff's IEP was reviewed on April 2, 2004. (Tr. 147-61). Plaintiff continued in the self-contained classroom at Jefferson Elementary School. She was functioning at the third grade level in reading and in spelling, where she showed consistent improvement; at the third to fifth grade level in language, with improvement shown in written expression, and at the "modified" fifth to sixth grade level in social studies. (Tr. 148). Concerns and weaknesses were identified in the areas of comprehension and decoding skills, language, written expression, and math calculations and word problems. (Tr. 149). It was determined that plaintiff would continue in placement outside the regular class for more than 60% of the school day. (Tr. 160).

The record includes plaintiff's report card for the fourth quarter of the academic year 2002-2003. (Tr. 73). Plaintiff received a grade of A in spelling, a B in science, Cs in reading, handwriting, mathematics, and social studies, and a D in language. She received satisfactory grades in art, vocal music, and physical education.

The Special School District completed a re-evaluation in the fall of 2004. (Tr. 137-46). Plaintiff's scores on the WISC-IV were as follows: Verbal IQ of 75, Nonverbal (Perceptual Reasoning) IQ of 63, and a Full Scale IQ of 67. (Tr. 142). These scores placed her in the borderline range of cognitive functioning. (Tr. 143). Plaintiff demonstrated low average abilities in processing information presented visually, low working memory, and an average processing speed. (Tr. 143-44). On September 4, 2004, the Woodcock-Johnson Tests of Achievement-Third Edition were administered to plaintiff. Consistent with the initial evaluation, plaintiff's academic achievement fell below expectations for her measured intellectual ability: In the "Broad Reading" Cluster, plaintiff's grade equivalent was 2.8; in the "Broad Written Expression" Cluster, plaintiff's grade equivalent was 2.9; and in the "Broad Mathematics" Cluster, she received a grade equivalent of 2.7. Her grade equivalents were 3.0 in academic skills, 3.3 in academic fluency, and 2.1 in academic applications. (Tr. 141). She demonstrated adequate adaptive behaviors in daily living and socialization, with great difficulty in the areas of receptive language and written language. (Tr. 144).

The record contains a full report card for the 2003-2004 academic year. (Tr. 72). Plaintiff received As in social studies and science, Bs in spelling and health, Cs in reading, language and mathematics, and a D in handwriting. In the first quarter, plaintiff's teacher commented that plaintiff's attitude and effort as good. The second quarter comment noted that plaintiff continued to make progress in most areas, with more practice needed in spelling and written expression. The third quarter comment likewise noted that more work was needed in spelling, written expression, and hand writing. The fourth quarter comment reported that plaintiff had a good attitude and was a hard worker.

Plaintiff's final grades at the conclusion of academic year 2004-2005 were as follows: As in social studies and mathematics, Bs in communication arts and reading, and C in science. The record does not include the key to the teachers' comments. (Tr. 75-76).

## 2. **Disability Evaluations**

Thomas Davant Johns, Ph.D., completed a consultative psychological evaluation on December 29, 2003. (Tr. 239-44). Dr. Johns observed that plaintiff was initially uncooperative, and refused to state her age until prompted by her mother. Her cooperation was somewhat better thereafter although she was not spontaneously verbal. (Tr. 239). Ms. Kirksey reported that plaintiff had been suspended one time for fighting and was not having any behavioral problems at school at the time of the evaluation. By contrast, Ms. Kirksey described plaintiff as oppositional at home, with talking back, and occasional tantrums.

Dr. Johns noted that there was no pattern of behavior suggestive of a conduct disorder. Plaintiff had never been involved with juvenile justice authorities or police. Dr. Johns noted that "[i]t was clear that the mother frequently gives in on disciplinary consequences." Plaintiff was treated psychiatrically in 1998 because of alleged sexual abuse. Plaintiff was never psychiatrically hospitalized or treated with psychotropic medications. During the assessment, Dr. Johns did not observe any increased motor activity or distractibility that was suggestive of attention deficit hyperactivity disorder. (Tr. 240). Plaintiff's daily living activities were "intact at an age appropriate level." Plaintiff needed occasional reminders to bathe but was independent in all other areas. (Tr. 241).

Plaintiff presented as well groomed and casually dressed in an age-appropriate manner. She was not spontaneous at any time with her verbalizations and initially refused to answer questions until confronted by her mother. She became oppositional again halfway through testing. Her thought processes were within normal limits with age-appropriate content. Her speed of speech was within normal limits and quality and productivity appeared to be normal. Plaintiff displayed no tangentiality, flight of ideas, or perseveration. (Tr. 241).

Dr. Johns attempted to administer the WISC-III. Plaintiff was initially cooperative, with good effort and persistence. Her performance fell "precipitously" halfway through the test, however, leading Dr. Johns to seek intervention from the caseworker at the

Section for Disability Determinations and plaintiff's mother. (Tr. 242). Plaintiff's performance did not improve markedly. Plaintiff's scores were as follows: Verbal IQ -- 72, Performance IQ -- 70, and Full Scale IQ -- 69. Dr. Johns opined that, although the Full Scale score placed plaintiff at the upper aspect of the mild range of mental retardation, this was more reflective of a lack of effort than actual ability, which Dr. Johns judged to be in the low borderline range. (Tr. 243). No significant variability was found among the verbal subtests. Relative strengths were found in the following areas: fund of information gained from education and experience, and logical and abstract reasoning ability. Plaintiff showed a relative weakness in practical knowledge and social judgment. There was significant variability among the performance subtests. Plaintiff had significant strengths in speed of learning and copying symbols. Relative weaknesses were identified in social interpretation, logical sequencing, and visual perception and analysis. Id.

Dr. Johns diagnosed plaintiff on Axis I with Learning Disorder not otherwise specified by prior history and partially supported by current assessment, and oppositional defiant disorder, mild. On Axis II, Dr. Johns diagnosed plaintiff with borderline intellectual functioning. Dr. Johns assessed plaintiff's current Global Assessment of Functioning (GAF) at 60.[6]

---

[6]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American

On January 16, 2004, R. Rocco Cottone, Ph.D., completed a
Childhood Disability Evaluation Form. (Tr. 218-22). Dr. Cottone
assessed plaintiff as having no limitation in the domains of moving
about and manipulating objects, self-care, and health and physical
well-being. (Tr. 220). He found a marked limitation in the domain
of acquiring and using information, and less than marked
limitations in the domains of attending and completing tasks and
interacting and relating with others. (Tr. 221).

### 3. __Application and related forms__

On October 16, 2003, Ms. Kirksey completed a Disability Report
as part of the application for SSI benefits. (Tr. 223-28). She
described her daughter's disabling condition as "Learning
disability, Asthma and she's hyperactive and has a behavior
disorder [and] was also molested at the age of three." (Tr. 224).
In describing the impact of plaintiff's conditions, Ms. Kirksey
stated, "She washes her hands too frequently may have a compulsive
disorder. She struggles with her school subjects such as reading,
math and spelling." __Id.__ Plaintiff had been treated by a doctor
for asthma. In response to questions on the Daily Activities
Report (Child) (Tr. 118-21), Ms. Kirksey noted that her daughter
had a hard time paying attention, understanding her reading
program, spelling, and comprehending words. (Tr. 118). She also
stated that she was "rude, some violent, like play too much . . .
she just loses her head sometime her cool." __Id.__ In describing her

---

Psychiatric Association, __Diagnostic & Statistical Manual of Mental
Disorders - Fourth Edition, Text Revision__ 34 (4th ed. 2000).

daughter's daily activities, Ms. Kirksey wrote that she washed up for school every morning and kissed her mother goodbye. After school, she did her homework and talked with her mother but "later in the study, nag[s] her brother [and] piss me and him off." Id. Plaintiff had no problems with school attendance. Plaintiff's chores included washing dishes, cleaning her room, and washing her clothes. She gave her mother a "hard time" about completing chores. (Tr. 120). In response to a question regarding problems her daughter had with understanding and following directions, Ms. Kirksey noted that sometimes her daughter did not listen; other times she stomped her feet and talked back. (Tr. 120).

On February 6, 2004, Ms. Kirksey completed a "Claimant's Statement when Request for Hearing Is Filed and the Issue Is Disability." (Tr. 107-09). She described her daughter as still struggling with "reading, paragraph, spelling words, math in school. Still have problem [with] her behavior, won't do her choir some time. Holl[er at] me talk back, fight her brother. Have nightmare of her molestation, masturbate and touch my body some time." She also wrote, "Same destruction of things in the house. Think she know things and understand when she don't. . . . She just really learn to match her clothes." (Tr. 107). She stated her daughter had a "bad temper," was "hyperactive" and "hit her brother when she [doesn't] get her way." (Tr. 109). Ms. Kirksey stated that plaintiff was seen every three months for treatment of asthma, sinuses, allergies, "female problems [and] mental problems." (Tr. 107).

## 4. **Medical Records**

Plaintiff received medical care at the Family Health Care Center. (Tr. 231-38, 247-48). Plaintiff was treated on November 11, 1999, for a cough and eczema. (Tr. 238). On January 10, 2001, plaintiff was diagnosed with reversible obstructive airway with underlying bronchitis and prescribed Albuterol, Zyrtec,[7] and Amoxicillin.[8] (Tr. 237). On March 15, 2001, plaintiff was diagnosed with asthma. Ms. Kirksey reported that she had not filled a prescription for Singulair because she was told she would have to pay for it. Id. Plaintiff was prescribed Flovent,[9] Singulair, and Albuterol. (Tr. 235). Plaintiff was seen on July 6, 2001, for symptoms of a cold and urinary tract infection. (Tr. 234). On follow-up ten days later, Ms. Kirksey reported that she had not given plaintiff the complete course of antibiotics prescribed for the urinary tract infection. (Tr. 233). On December 10, 2003, the pediatrician reported to the Disability Determinations Unit that plaintiff was not seen after 2001. (Tr. 116). Ms. Kirksey reported that she had not taken plaintiff to a doctor in a year or so. Her last asthma attack had been in the previous year. There had not been frequent visits to the emergency

---

[7]Zyrtec is indicated for relief of symptoms associated with allergic rhinitis and for treatment of hives. See Phys. Desk Ref. 2595 (61st ed. 2007).

[8]Amoxicillin is an antibiotic. See Phys. Desk Ref. 1315-16 (60th ed. 2006).

[9]Flovent is indicated for the maintenance treatment of asthma as a prophylactic therapy. See Phys. Desk Ref. 1448 (61st ed. 2007).

room or any hospitalizations related to asthma.  Ms. Kirksey said

she was able to get refills of Singulair.  Id.

### III.  Decision of the ALJ

In the decision issued on October 18, 2005, the ALJ made the

following findings:

1.  Plaintiff was thirteen years old and enrolled in middle
    school.

2.  Plaintiff had not engaged in substantial gainful
    employment since the alleged onset date.

3.  Plaintiff has borderline intelligence, learning
    disabilities and asthma, which is a severe combination of
    impairments.

4.  Plaintiff's borderline intelligence, learning
    disabilities and asthma do not meet or medically equal
    the severity of any impairment listed in Part B or Part
    A of Appendix 1, Subpart P of Part 404 of Chapter 20 of
    the Code of Federal Regulations, 20 C.F.R. §§
    416.924(d)(1), 416.925 and 416.926.

5.  Plaintiff does not have an extreme limitation in any
    domain of functioning.  Plaintiff has one marked
    limitation in a domain of functioning.  Plaintiff does
    not functionally equal the severity of the listings, 20
    C.F.R. 416.924(d)(2) and 416.926a.

6.  The subjective complaints were considered credible only
    to the extent they are supported by the evidence of
    record as summarized in the text of the decision.

7.  Plaintiff was not under a "disability" as defined in the
    Social Security Act at any time since the alleged onset
    through the date of the decision.

(Tr. 18-19).

### IV.  Discussion

To be eligible for SSI benefits, a claimant must prove that he

is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.

2001).  A child under the age of eighteen will be declared disabled

-16-

if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child claimant is disabled, the Commissioner employs a three-step evaluation process. The Commissioner first determines whether the child is engaged in substantial gainful activity. If the child is so engaged, he is not disabled. Second, the Commissioner determines whether the child has a "severe impairment." If the child's impairment is not severe, he is not disabled. Finally, the Commissioner determines whether the child's impairment meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the child's impairment is, medically equals, or functionally equals a listed impairment, he is disabled under the Act. 20 C.F.R. § 416.924 (2002).

In determining functional equivalence, the Commissioner considers the child claimant's functioning in broad areas of functioning, or "domains." The six domains are:

(i)   Acquiring and using information;

(ii)  Attending and completing tasks;

(iii) Interacting and relating with others;

(iv)  Moving about and manipulating objects;

(v)   Caring for oneself; and,

(vi)  Health and physical well-being.

20 C.F.R. § 416.926a(b)(1) (2002).  For an impairment to functionally equal a listed disability, it must result in either (1) marked limitations in two domains or (2) an extreme limitation in one domain.  20 C.F.R. § 416.926a.  The Commissioner will find a "marked" impairment in any domain when the impairment(s) interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities.  A "marked" impairment is the equivalent of functioning found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is found in a domain when a claimant's impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities.  It is the equivalent of functioning found on standardized testing with scores that are at least three standard deviations below the mean.  20 C.F.R. § 416.926a(e)(3)(i).

A.    **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d

-18-

722, 724 (8th Cir. 2002) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. <u>Estes</u>, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record. <u>See</u> <u>Stewart v. Sec. of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992). The Court must consider any evidence that detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B. <u>Plaintiff's Allegations of Error</u>

Plaintiff's administrative appeal raises the following allegations of error: (1) The ALJ erred in failing to find that plaintiff has an impairment that meets the listing, 20 C.F.R. Pt. 404, App. 1 to Subpt. P, 112.05D (Mental Retardation); and (2) The ALJ erred in failing to find that plaintiff has an impairment that satisfies the criteria for functional equivalence in the domains of acquiring and using information and attending and completing tasks. The Court agrees with plaintiff that the ALJ did not properly address Listing 112.05D and will remand this matter for further

consideration of whether plaintiff should be found disabled on that basis. The Court accordingly will not address plaintiff's functional equivalence argument.

Listing 112.05 governs mental retardation in children and provides as follows:

> Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

> * * *

> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 112.05.

Elsewhere, the regulations provide:

> For listing[] 112.05D . . . [the Commissioner] will assess the degree of functional limitation the additional impairment(s) imposes to determine if it causes more than minimal functional limitations, *i.e.*, is a "severe" impairment(s), as defined in § 416.924(c).

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 112.00.

Section 416.924(c) provides:

> You must have a medically determinable impairment(s) that is severe. If you do not have a medically determinable impairment, or your impairment(s) is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, [the Commissioner] will find

that you do not have a severe impairment and are, therefore, not disabled.

Defendant contends that Listing 112.05D creates a three-element test and that, in addition to establishing a valid qualifying IQ score and an additional and significant limitation, plaintiff must also establish that she has "significant deficits in adaptive functioning," as stated in the introductory paragraph of Listing 112.05. The Court believes that defendant is mistaken in his assertion that the quoted language from the introductory paragraph creates a third element in the child mental retardation listing. Plainly, a claimant who establishes the existence of "a physical or other mental impairment imposing an additional and significant limitation of function" as set forth in 112.05D will also satisfy the requirement of "significant deficits in adaptive functioning." The Eighth Circuit's decision in <u>Maresh v. Barnhart</u>, 438 F.3d 897 (8th Cir. 2006), cited by defendant, is not to the contrary. In <u>Maresh</u>, the Eighth Circuit found that in order to establish disability under the adult mental retardation listing, a claimant was required to prove onset before age 22, as stated in the Listing's introductory paragraph.[10] The age of onset is not at

_____

[10]Listing 12.05 provides:
  Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning <u>initially manifested . . . before age 22</u>.

  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

-21-

issue for a child claimant and the listings are otherwise identical.

Plaintiff's IQ was first assessed on July 18, 2000, when she received the following scores: Verbal IQ -- 76, Performance IQ -- 70, Full Scale IQ -- 71. (Tr. 214). Dr. Johns administered another IQ test on December 29, 2003 and assessed the following scores: Verbal IQ -- 72, Performance IQ -- 70, and Full Scale IQ -- 69. Dr. Johns noted that plaintiff's scores were probably depressed due to lack of effort and opined that she was within the borderline, rather than mentally retarded, range. (Tr. 243). A test administered on September 3, 2004, yielded the following scores: Verbal IQ – 75, Nonverbal – 63, and Full Scale – 67. On this occasion, the examiner opined that the test scores were a valid sample of plaintiff's functioning. (Tr. 142).

In this case, the ALJ determined that "Listing 112.05 is not met or medically equaled because [plaintiff] has borderline intellectual functioning rather than mental retardation. Listing 112.05 requires that she be mentally retarded." The ALJ did not specifically cite Listing 112.05D or address the fact that plaintiff received a qualifying score each time her IQ was assessed. It was incumbent upon the ALJ to explain specifically why the listing was not met and his failure to do so is error

---

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added), quoted in Maresh, 438 F.3d at 899.

requiring remand to explain why plaintiff's condition does not medically equal Listing 112.05D.

Defendant argues that plaintiff does not satisfy Listing 112.05D because no evaluator ever diagnosed plaintiff as mentally retarded. However, as defendant acknowledges, the listing does not require a formal diagnosis. Maresh, 438 F.3d at 899 (noting that the Commissioner rejected a proposal to adopt the definition of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition). Defendant does not contend that plaintiff's qualifying IQ scores are invalid and, thus, the Court finds that the first element of Listing 112.05D is satisfied.

In order to satisfy the second element of the Listing, plaintiff must establish that she has a physical or other mental impairment imposing an additional and significant limitation of function, *i.e.*, a "severe" impairment. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 112.00. A severe impairment causes "more than minimal functional limitations." 20 C.F.R. § 416.924(c). Plaintiff argues that her learning disabilities constitute an impairment imposing an additional and significant limitation of function. This is a matter that the ALJ must address upon remand.

**V. Conclusion**

For the reasons discussed above, the Court finds that the ALJ failed to properly consider whether plaintiff's impairments are medically equal to Listing 112.05D.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for a proper determination of whether plaintiff's impairments medically equal Listing 112.05D.

A separate judgment in accordance with this order will be entered this same date.

                                          _____
                                          CAROL E. JACKSON
                                          UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2007.